2015 IL App (1st) 130127

FIRST DISTRICT
DECEMBER 28, 2015

No. 1-13-0127

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 17920 |
| | ) | |
| DERRICK HATCHETT, | ) | Honorable |
| | ) | Nicholas R. Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justices Connors and Harris concurred in the judgment and opinion.

## OPINION

¶ 1     This appeal arises from the November 28, 2012 order entered by the circuit court of Cook County, which dismissed defendant Derrick Hatchett's postconviction petition after an evidentiary hearing at the third stage of the proceedings. On appeal, the defendant argues that the circuit court erred in denying his requested relief for a new trial by dismissing his postconviction petition after a third-stage evidentiary hearing, where he made a substantial showing that he was denied his constitutional right to effective assistance of counsel. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3     On September 22, 2003, Patrick Taylor was shot multiple times on South Lowe Avenue in Chicago, Illinois. He died of his injuries the next day. In 2004, the defendant and

codefendant Arthur Foote (Foote) were charged with first-degree murder and aggravated battery of the victim.

¶ 4    On August 11, 2005, private attorney Eric Dunham (Attorney Dunham) appeared in court on behalf of both the defendant and Foote, at which time he informed the trial court that he would probably "be separating [himself] from one of the cases" and would let the State know when that time came.

¶ 5    On November 30, 2005, Attorney Dunham appeared in court on behalf of both the defendant and Foote. The State raised the issue of a potential conflict of interest in Attorney Dunham's joint representation of the defendant and Foote "when and if this case goes to trial." In response, the trial court noted that Attorney Dunham had acknowledged the possibility of a conflict of interest, and that the court would deal with the issue if it came to fruition after the pretrial motions were resolved.

¶ 6    On May 3, 2006, the trial court granted the defendant's motion to suppress his statement to the police, finding that inexplicable injuries which the defendant sustained while in police custody showed that his confession was a product of coercion.

¶ 7    On September 20, 2006, at a court hearing, the State indicated that there might be a conflict of interest in Attorney Dunham's representation of both the defendant and Foote in the event that the State makes a plea offer to one of them:

> "[MR. AHERN] [Assistant State's Attorney]: Are you going to represent both guys for the trial?
>
> [MR. DUNHAM]: Yes, I am.
>
> [MR. AHERN]: Because I wanted to make an offer on one. If there is an inherent conflict in that. I don't know what the case

law is. If I make an offer on one defendant, it is an inherent conflict to the other defendant. It's clear because of what the offer would entail.

[THE COURT]: It depends on what the offer would entail.

[MR. AHERN]: It is going to entail exactly what you're thinking."

Thereafter, the parties engaged in off the record discussions with the trial court and the case was continued for another status date.

¶ 8 On October 3, 2006, at the next court date, Attorney Dunham noted that the State "was to possibly make an offer to the defendants" and that the "question of whether I can represent both of them" has surfaced. Attorney Dunham informed the court that he had "spoken with the defendants and they both informed me anything short of total dismissal of these charges would not be accepted, so I do not envision any—." The trial court then set the matter for a trial date on November 20, 2006.

¶ 9 On November 20, 2006, Attorney Dunham appeared in court for both the defendant and Foote and made a demand for trial.

¶ 10 On December 12, 2006, at the next court date, the State again raised the issue of Attorney Dunham representing both the defendant and Foote. The following exchange ensued:

"[MR. AHERN]: It's about counsel representing both [d]efendants. I had told him I thought there was a direct conflict, especially since I hypothetically offered one, Hatchett, time considered served or five years or time considered served on second for co-offender. Counsel said he wasn't interested in offers.

The facts of the case we had reversed here for the very same reasons, according to *White*. It's inherent conflict. Even especially when I make the offer it's inherent conflict between the two people who is considering being advised on testifying against his other client and that's inherent conflict. That's the first issue.

Second issue, counsel and I talked on the phone yesterday about one of the – the eyewitnesses in the case, [Tron] Johnson. He has done handwritten for the State as both offenders being actors in the shooting. Counsel had told me – he can speak for himself; but it was his understanding [Tron] Johnson could not testify because the statement of Derrick Hatchett was suppressed and therefore since [Tron] Johnson was named in the statement and that's how the police got his name, we could not call him as a witness. It wasn't pled anywhere in the document that [Tron] Johnson was to be excluded.

\* \* \*

[MR. DUNHAM]: We are saying that statement, the handwritten statement that [Tron Johnson] made after Hatchett's statement, should not be able to be used.

[THE COURT]: Why?

[MR. DUNHAM]: Because it is part of the fruit of the poisonous tree. If that statement had never been shown to Mr.

Johnson, he would not have – it's our position he would not have wrote [*sic*] a statement. \*\*\*

[THE COURT]: I would not consider that fruit of the poisonous tree. \*\*\* There is no way that would be considered fruit of the poisonous tree. \*\*\* Fact of the matter is that wouldn't prevent him from testifying and for the State, for that matter, to use whatever statement he may have given as substantive evidence. Of course, if he has given conflicting statement, that could come in as well as impeachment. \*\*\* We have to get to this first issue because it sounds to me as if the State may have a point regarding conflict. Let's deal with that.

[MR. DUNHAM]: Judge, as I spoke to you, as I have stated throughout this time, should they get to a point that there is a conflict, we will bring another attorney.

[THE COURT]: Now is the time and it sounds like there is a conflict.

[MR. DUNHAM]: Judge, we don't think there is a conflict.

[THE COURT]: \*\*\* It sounds as if there is a conflict. \*\*\* You said something about and I don't know whether you were saying hypothetically or whether or not an offer had been made.

[MR. DUNHAM]: It was hypothetical.

[MR. AHERN]: It was hypothetical I said if I gave him ten years time considered served you would have to take that to him.

Obviously the circumstances of the State's case change[d] after the motion to suppress [was granted]. That's why the State would make the offer. Therein lies the conflict. I feel it's a conflict so I am not going to – I wasn't going to convey the real offer, but I told him I wanted to.

[THE COURT]: You want to what?

[MR. AHERN]: I wanted to convey an offer to Derrick Hatchett.

[THE COURT]: That's where you say counsel wasn't interested in an offer.

[MR. AHERN]: I say, if I offered time considered served, that's something he would be interested in.

[THE COURT]: But he would be bound to take the offer.

[MR. AHERN]: That's correct, Judge.

[MR. AHERN]: How do you counsel one client to testify against the other client, really it's tickly [*sic*].

[THE COURT]: You don't without passing through the ARDC.

[MR. AHERN]: That's true. That's actually one of how it falls with counsel in the *White* case was the ARDC.

[THE COURT]: That's right. Well, I can't deal with a hypothetical.

[MR. AHERN]: If he gets an attorney—

> [THE COURT]: No. Off the record. (Whereupon, a discussion was held off the record).
>
> [THE COURT]: Back on the record. I think it's fairly clear there is a conflict and, Mr. Dunham, you have to make a decision about who you represent and the other person will either have to secure his own attorney or, if he is indigent, we will have to appoint one.
>
> [MR. DUNHAM]: Judge, for the record, I will be representing Derrick Hatchett. Also for the record, *** Mr. Foote is, indeed, indigent."

Subsequently, after Attorney Dunham withdrew from Foote's case and chose to only represent the defendant, the trial court appointed Foote a new attorney.

¶ 11 On March 6, 2007, a bench trial was held during which several witnesses testified, including Sergeant John Ryan and Tron Johnson. Sergeant Ryan testified to responding to a "call of a man shot" on the 5700 block of South Lowe Avenue on the night of the shooting. When Sergeant Ryan arrived at the scene, he saw the victim sitting on the sidewalk against a fence with his eyes closed. Sergeant Ryan noticed that the victim had at least one gunshot wound to his face, was bleeding from numerous spots on his face, had large bloodstain on his chest, and had shallow breathing. Sergeant Ryan testified that when he asked the victim what had happened, the victim stated that "Quick and Little Ride" had shot him. Over defense counsel's objections, the trial court admitted the victim's statements regarding the identities of the shooters as either an excited utterance or a dying declaration exception to hearsay. "Quick" and "Little Ride" were established at trial as the nicknames of Foote and the defendant, respectively.

At trial, Johnson, who was an eyewitness to the shooting, denied seeing the defendant and Foote fire any weapons. Instead, he claimed that the shots were fired by "some guys off the porch" in the neighborhood. The State then impeached Johnson with his prior written statement to an assistant State's Attorney, in which he had admitted to seeing the defendant and Foote chase and fire multiple shots at the victim. Johnson's prior written statement was then admitted as substantive evidence at trial over defense counsel's objections.[1] The trial court found the defendant guilty of first-degree murder and later sentenced him to 45 years in prison.

¶ 12    On direct appeal, the defendant set forth several bases for reversal, including that he was denied effective assistance of counsel. On December 29, 2009, in affirming his conviction and sentence, this court declined to consider the defendant's claim that defense counsel was ineffective due to a conflict of interest stemming from his dual representation of the defendant and Foote during pretrial proceedings. *Hatchett*, 397 Ill. App. 3d at 510. Instead, this court stated that this issue was more appropriate for resolution in postconviction proceedings rather than in the context of direct appeal. *Id.*

¶ 13    On May 21, 2010, the defendant filed a petition for postconviction relief, claiming that defense counsel was ineffective due to his conflict of interest in representing both him and Foote during pretrial proceedings. Attached to the postconviction petition were the transcripts of pretrial proceedings and the affidavits of Shipan White, Juanita Perkins, and the defendant. The postconviction court advanced the petition to the second stage of the proceedings. On November 17, 2010, the State filed a motion to dismiss the postconviction petition, which the

---

[1] A detailed recitation of the facts in the case is set forth in this court's December 29, 2009 opinion resolving the defendant's direct appeal. See *People v. Hatchett*, 397 Ill. App. 3d 495 (2009).

postconviction court denied and advanced the petition to the third stage of the proceedings for an evidentiary hearing.

¶ 14    On April 12, 2012, an evidentiary hearing commenced.  The defense presented the testimony of Attorney Dunham, the defendant, and Juanita Perkins (Perkins), who was the defendant's girlfriend.  The State presented the testimony of assistant State's Attorneys Scott Clark (ASA Clark) and Gregory Ahern (ASA Ahern).  Attorney Dunham testified at the evidentiary hearing that the State initially made the same offer to both defendants of approximately 20 years of imprisonment in exchange for a plea of guilty.  However, after the trial court granted the motion to suppress the defendant's statement, the State did not make a "firm offer" to him and "no plea offer *** was actually given."  Attorney Dunham stated that if he had understood the State to be making an offer requiring the defendant to testify against Foote, he would have informed both defendants and would have withdrawn from one of their cases.  He also noted that had the State made an offer, he would have taken it to the defendant. Attorney Dunham conceded that he signed an affidavit dated June 28, 2011, in which he averred that he did not give sufficient consideration to a plea offer, and that he should have requested separate counsel for the defendant to advise him on the wisdom of accepting a plea offer. Attorney Dunham explained at the evidentiary hearing that "the only offer that was given was a hypothetical one that was given in court," and that there was no plea offer to consider.  He further explained that in retrospect, "he could have potentially proceeded to go after a plea based on that hypothetical."  Finally, Attorney Dunham clarified that his affidavit only pertained to the time period while he jointly represented both defendants.  Attorney Dunham testified that once he chose to solely represent the defendant, he had no "divided loyalty" and maintained that he did not have any conflict of interest even before that time.  Attorney Dunham further testified

that after the trial court granted the defendant's motion to suppress on May 3, 2006, he was "extremely confident" that the defendant would be acquitted.

¶ 15    The defendant testified at the evidentiary hearing, stating that he met Attorney Dunham through Foote because Attorney Dunham had represented Foote in an unrelated matter and had a relationship with Foote's aunt.  He testified that once there was "ambiguous" discussion about a possible plea deal, he asked Attorney Dunham to discuss the deal, but he failed to do so. However, the defendant conceded that, although he was present when the hypothetical deal was being discussed in court during pretrial proceedings, he did not object to Attorney Dunham's statement that neither he nor Foote would accept anything short of total dismissal of the charges. The defendant explained that he did not "independently" attempt to work out a plea deal because Attorney Dunham told him not to accept a deal where he would have to testify against Foote. The defendant, however, also testified that he felt no "particular loyalty" to Foote and was willing to do "what was best for me at the time."  The defendant further noted that he would have accepted a deal which included him testifying against Foote had Attorney Dunham brought such a deal to his attention.  In addition, the defendant testified that he first retained Attorney Dunham in 2001 on an unrelated attempted murder charge.  The defendant, however, testified that he had never met Attorney Dunham prior to 2004, when he was arrested on the instant first-degree murder charge with Foote and Foote paid a $500 retainer to Attorney Dunham.  The reason that he had never met Attorney Dunham until 2004 was because he had fled the jurisdiction after being charged with attempted murder in the unrelated crime in 2001.  The defendant also testified that after he was convicted of first-degree murder in the instant case, he continued to retain Attorney Dunham as his counsel in the attempted murder case.  In the attempted murder

case, Attorney Dunham successfully negotiated a 4-year sentence in exchange for the defendant's guilty plea, which the defendant accepted.

¶ 16    Perkins, who was the defendant's girlfriend, testified at the evidentiary hearing that she met Attorney Dunham through Foote. She stated that Foote hired Attorney Dunham to represent the defendant in this case by making the initial payment, but that Perkins and the defendant's mother, Sharon Fleming, made subsequent payments to Attorney Dunham on behalf of the defendant. Perkins understood Attorney Dunham to be a relative of Foote. Perkins attended all but one of the defendant's court dates while the instant case was pending before the trial court. At one of the court dates, she heard the assistant State's Attorney say something about a plea offer to the defendant and she then asked Attorney Dunham about it. Attorney Dunham told her that neither the defendant nor Foote wanted anything "short of dismissal of the whole case" and that the defendant would have to "flip on" Foote. According to Perkins, Attorney Dunham told her that the case against the defendant was weak and that the defendant should not accept any plea offers. She denied that she ever discussed with Attorney Dunham about whether the defendant's case would go to trial.

¶ 17    ASA Clark testified for the State at the evidentiary hearing that he was assigned to the defendant's murder case in 2006. At that point, both the defendant and Foote were represented by different counsel. ASA Clark had reviewed the trial file and learned that no plea offer had ever been made to the defendant and that Attorney Dunham had made a statement on the record that neither the defendant nor Foote would accept any plea offer other than total dismissal of their charges. A note in the trial file also indicated the neither the defendant nor Foote wanted an offer. ASA Clark neither extended any plea offers to Attorney Dunham or the defendant, nor did anyone ever approach ASA Clark about an offer for the defendant.

¶ 18     ASA Ahern testified for the State that during pretrial proceedings on December 12, 2006, Attorney Dunham was still jointly representing the defendant and Foote, and ASA Ahern raised the issue of Attorney Dunham's potential conflict with the court.  ASA Ahern told the court that he believed a conflict existed in the dual representation and that even if the State were hypothetically thinking to make a plea offer to one of the defendants for time served, such an offer could never be made to the defense due to the joint representation.  In recounting the colloquy between the parties' counsel and the trial judge, ASA Ahern testified that he had informed the court at that time that because of the dual representation, he could not even get to the point of making a real offer to either defendant.  ASA Ahern noted that, at that time, he could not even know what kind of deal he would offer because he had yet to speak with his supervisor about "which ones flip or what to offer," he had yet to speak with any of the witnesses to assess the strength of the case, and he had yet to speak with the victim's family.  ASA Ahern clarified that he never made either the defendant or Foote any real offers, and that it never passed "the preliminary hypothetical stage."  ASA Ahern stated that his motivation in seeking separate counsel to represent the defendant and Foote was to "leave the option open if I wanted to strengthen the case against one or the other" by having one testify against the other.  He noted that at the December 12, 2006 proceedings, the trial court ruled that there was a conflict of interest and, subsequently, each defendant had separate counsel.  ASA Ahern further testified that although he was not in court during the October 3, 2006 court date, he later learned from another prosecutor who was present on that court date that Attorney Dunham had stated on the record that neither the defendant nor Foote was interested in an offer unless it involved total dismissal of the charges against them.  ASA Ahern had no reason to doubt the veracity of what

his fellow prosecutor relayed to him. ASA Ahern further testified that, after the December 12, 2006 proceedings, his assignment changed and he no longer worked on this case.

¶ 19    The parties stipulated that if recalled to testify, Attorney Dunham would testify that he had multiple conversations with the defendant outside the presence of Foote, and that he never told the defendant's sister, Shapan White, or anyone that there was a plea off made to him by the State.

¶ 20    On November 28, 2012, the postconviction court dismissed the defendant's petition, finding that the defendant had failed to make a substantial showing of a constitutional violation of his right to effective assistance of counsel due to a conflict of interest in Attorney Dunham's joint representation of the defendant and Foote in pretrial proceedings. Specifically, the postconviction court found Attorney Dunham to be a credible witness and the defendant's testimony to be "entirely incredible."

¶ 21    On December 18, 2012, the defendant filed a timely notice of appeal.

¶ 22                                 ANALYSIS

¶ 23    The relevant inquiry before this court on appeal is whether the postconviction court properly denied the requested relief for a new trial and dismissed the defendant's postconviction petition after an evidentiary hearing at the third stage of the proceedings.

¶ 24    The defendant argues that he was denied his sixth amendment right to counsel (U.S. Const., amend VI) when Attorney Dunham represented both him and Foote during pretrial proceedings. He contends that this dual representation prejudiced him, where Attorney Dunham failed to advise him of the plea offer by the State and the impact of the conflict of interest. The defendant also argues that after Attorney Dunham elected to solely represent him on December 12, 2006, the trial court failed to admonish him regarding the implications of counsel's continued

representation or the implications of the conflict of interest. Because of Attorney Dunham's relationship with Foote's family, according to the defendant, counsel protected Foote and failed to pursue a plea negotiation with the State which would entail the defendant testifying against Foote. Moreover, he argues, there was no evidence that he intentionally waived his right to a conflict-free counsel, nor was there any evidence that he consented to the continued representation by Attorney Dunham either before or after the disclosure of the conflict. He contends that the trial court's finding that the State merely made a hypothetical offer, begs the question of why Attorney Dunham did not pursue the offer after electing to only represent him, and he argues that counsel's defective performance in failing to investigate the plea offer and in failing to counsel him, as a result of the conflict of interest, unduly prejudiced him.

¶ 25 The State counters that the postconviction court properly dismissed the defendant's petition at the third stage, where the defendant failed to make a substantial showing that he was denied effective assistance of counsel due to a conflict of interest during pretrial proceedings. The State argues that the trial court acted properly by terminating the dual representation; that the defendant's claim that the trial court should have admonished him about the conflict of interest after the dual representation dissolved, was bereft of legal support; that his claim that Attorney Dunham failed to investigate the plea offer is refuted by the record showing that no real offer was made by the State during the period of joint representation; and that the defendant failed to show any specific defect in counsel's performance or any resulting prejudice. The State further points out that nothing precluded the defendant from seeking to enter into plea negotiations with the State after the joint representation had terminated three months before trial began.

¶ 26    When a postconviction petition is advanced to the third-stage evidentiary hearing, where fact finding and credibility determinations are involved, as in the instant case, a reviewing court will not reverse the circuit court's decision unless it is manifestly erroneous. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). A decision is manifestly erroneous if it contains an error that is clearly evident, plain, and indisputable. *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 152.

¶ 27    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) provides a three-step procedural mechanism by which a convicted defendant can assert that there was a substantial denial of his constitutional rights in the proceedings which resulted in his conviction. *People v. Harris*, 224 Ill. 2d 115 (2007). "A postconviction proceeding is not an appeal from the judgment of conviction, but is a collateral attack on the trial court proceedings." *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). "Consequently, issues that could have been raised on direct appeal but were not are forfeited." *Id.* Under the Act, a defendant bears the burden of establishing that a substantial deprivation of his constitutional rights occurred. *People v. Waldrop*, 353 Ill. App. 3d 244, 249 (2004). At the first stage, a postconviction petition may be summarily dismissed if the claims in the petition are frivolous and patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009); see 725 ILCS 5/122-2.1(a)(2) (West 2010)). However, if the petition survives initial review, the process moves to the second stage, where the circuit court appoints counsel for the defendant when the defendant cannot afford counsel. 725 ILCS 5/122-4 (West 2010). Appointed counsel then has an opportunity to amend the defendant's *pro se* postconviction petition. See *People v. Slaughter*, 39 Ill. 2d 278, 284-85 (1968). The State may then file a motion to dismiss or an answer to the postconviction petition. 725 ILCS 5/122-5 (West 2010). At the second stage of the proceedings, if the State moves to dismiss the petition, the circuit court may hold a dismissal hearing, which is still part of the second stage. *People v.*

*Wheeler*, 392 Ill. App. 3d 303, 308 (2009). "[T]he circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). However, the circuit court is foreclosed from engaging in any fact-finding because all well-pleaded facts are to be taken as true at this point in the proceedings. *Wheeler*, 392 Ill. App. 3d at 308. If a substantial showing of a constitutional violation is set forth, the petition advances to the third stage for an evidentiary hearing. *Edwards*, 197 Ill. 2d at 246. At the evidentiary hearing, the defendant bears the burden of making a substantial showing of a deprivation of constitutional rights. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002).

¶ 28    In the case at bar, the defendant filed a postconviction petition alleging that defense counsel was ineffective due to his conflict of interest in representing both he and Foote during pretrial proceedings. To prevail on a claim of ineffective assistance of counsel, the defendant: (1) must prove that counsel's performance fell below an objective standard of reasonableness so as to deprive him of the right to counsel under the sixth amendment (performance prong); and (2) that this substandard performance resulted in prejudice (prejudice prong). *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984). To establish the performance prong, the defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction was sound trial strategy. *People v. Lopez*, 371 Ill. App. 3d 920, 929 (2007). Because effective assistance of counsel refers to competent, not perfect, representation, "matters relating to trial strategy are generally immune from claims of ineffective assistance of counsel." *Id.* at 929. Further, in determining the adequacy of counsel's representation, "a reviewing court will not consider isolated instances of misconduct, but rather the totality of the circumstances." *Id.* To establish prejudice, the defendant must show that "there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceedings would have been different." (Internal quotation marks omitted.) *People v. King*, 316 Ill. App. 3d 901, 913 (2000). A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* The defendant must satisfy both prongs to prevail on his claim of ineffective assistance of counsel. However, a reviewing court may analyze the facts of the case under either prong first, and if it deems that the standard for that prong is not satisfied, it need not consider the other prong. *People v. Irvine*, 379 Ill. App. 3d 116, 129-30 (2008).

¶ 29    A defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. *People v. Hardin*, 217 Ill. 2d 289, 299 (2005). "Such representation means assistance by an attorney whose loyalty to his or her client is not diluted by conflicting interests or inconsistent obligations." *People v. Taylor*, 237 Ill. 2d 356, 374 (2010). The joint representation of criminal codefendants is not *per se* violative of the constitutional guarantee of conflict-free representation." *Id.* at 375. Further, " 'defense strategy in multiple representation situations often will invite, through hindsight, conceived notions that the representation adversely affected the interests of at least one defendant at some point in the trial process.' " *Id.* at 375, (quoting *People v. Vriner*, 74 Ill. 2d 329, 342 (1978)). However, our supreme court has consistently held that a conflict of interest is not inherent in the joint representation of criminal codefendants merely by virtue of such representation. *Taylor*, 237 Ill. 2d at 375; *Vriner*, 74 Ill. 2d at 340; accord *People v. Orange*, 168 Ill. 2d 138, 156 (1995).

¶ 30    "The analysis of an alleged conflict depends on when the issue was raised before the trial court." *People v. Clark*, 374 Ill. App. 3d 50, 62 (2007). "If the potential conflict is brought to the attention of the trial court by counsel at an early stage, a duty devolves upon the trial court to either appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict

was too remote to warrant separate counsel." *Id.* Reversal for the trial court's failure to alleviate possible or potential conflicts does not require a showing of "specific prejudice." (Internal quotation marks omitted.) *Id.* (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 18 (1988)). However, if the trial court is not apprised of the potential conflict, then the defendant must show that an actual conflict of interest adversely affected counsel's performance and must point to some specific defect in counsel's strategy, tactics, or decision making attributable to the conflict. *Clark*, 374 Ill. App. 3d at 62. In the case at bar, the conflict pertaining to Attorney Dunham's dual representation of the defendant and Foote was brought to the attention of the trial court by the State and was resolved at an early stage during pretrial proceedings on December 12, 2006— three months before the defendant's bench trial commenced on March 6, 2007. The trial court found that a conflict of interest existed and properly alleviated any further potential conflict by appointing separate counsel for Foote and by allowing Attorney Dunham to solely represent the defendant. Thus, the trial court did not fail to fulfill its duty after being apprised of the potential conflict of interest and, therefore, any conflict of interest ceased to exist after December 12, 2006. The defendant argues that, after Attorney Dunham elected to solely represent him on December 12, 2006, the trial court failed to admonish him regarding the implications of counsel's continued representation or the implications of the conflict of interest. However, we find no legal authority, and the defendant does not cite any, to support the notion that the trial court had an additional duty to admonish the defendant about the conflict of interest even *after* the dual representation was resolved and the risk of a conflict of interest was removed. It is also crucial to note that, as the record reveals, the defendant was present for all of the pretrial proceedings leading up to and including the December 12, 2006 court date, and presumably heard and was

aware of all discussions between the trial court and the parties' attorneys regarding the issue of conflict of interest. Thus, the defendant's argument on this basis must fail.

¶ 31    The defendant also argues that there was no evidence that he ever consented to the continued representation by Attorney Dunham either before or after the disclosure of the conflict of interest. To the extent that the defendant now complains he was denied his right to counsel of *choice*, we find this argument to be forfeited for review on appeal where it was not raised in his postconviction petition. See *People v. Jones*, 211 Ill. 2d 140, 148 (2004); *People v. Petrenko*, 237 Ill. 2d 490, 502 (2010) (issue not raised in the postconviction petition is not reviewable on appeal). Nevertheless, the transcripts of the pretrial proceedings, which were attached to the postconviction petition, show that the defendant, despite being present at every relevant court hearing, never objected to being represented by Attorney Dunham. Testimony at the evidentiary hearing shows that although Foote initially paid $500 to retain Attorney Dunham to represent the defendant, Perkins and the defendant's mother made subsequent payments to counsel on behalf of the defendant. There is no evidence that the defendant ever objected to Perkins and his mother's continuing payments to Attorney Dunham during pretrial and trial proceedings. In fact, the defendant's own testimony reveals that he retained Attorney Dunham as counsel in 2001 on an unrelated attempted murder charge and that he continued to be represented by Attorney Dunham in that unrelated case even after he was convicted of murder in the instant case. Therefore, we find the defendant's contention regarding his right to counsel of choice, to be without merit.

¶ 32    In arguing for reversal, the defendant claims that evidence adduced at the third-stage evidentiary hearing supports the notion that Attorney Dunham labored under a conflict of interest when he jointly represented the defendant and Foote during pretrial proceedings from August 11,

2005 to December 12, 2006. The bulk of the defendant's claim of ineffective assistance of counsel pertains to his arguments that, during this joint representation period, Attorney Dunham's performance was deficient because counsel failed to "investigate" and "pursue plea negotiations" entailing the defendant to testify against Foote, failed to advise him of the State's plea offer, and failed to pursue a plea offer on his behalf after electing to only represent him.

¶ 33  We find that the postconviction court did not commit manifest error in dismissing the defendant's petition at the third stage, where the defendant failed to make a substantial showing that he was denied effective assistance of counsel due to a conflict of interest during pretrial proceedings. The record shows that on August 11, 2005, Attorney Dunham appeared in court on behalf of both the defendant and Foote, and informed the trial court that he would probably "be separating [himself] from one of the cases" but would let the State know when that time came. On November 30, 2005, Attorney Dunham appeared in court on behalf of both the defendant and Foote. The State raised the issue of a potential conflict of interest in defense counsel's dual representation, which the trial court responded by noting that Attorney Dunham had acknowledged the possibility of a conflict of interest and the court would address the issue if it came to fruition after the pretrial motions were resolved. On May 3, 2006, the trial court granted the defendant's motion to suppress his incriminating statement to the police, finding his confession to be a product of coercion. Thereafter, at the September 20, 2006 court hearing, the State, without specifying which defendant, noted that there might be a conflict of interest in Attorney Dunham's dual representation in the event that the State makes a plea offer to one of them. After the parties engaged in off the record discussions, the case was continued for another status date. On October 3, 2006, at the next court date, Attorney Dunham informed the trial court that he had spoken with the defendant and Foote and they both informed counsel that

"anything short of total dismissal of these charges would not be accepted." At the December 12, 2006 court date, the State again raised the issue of a potential conflict in defense counsel's dual representation. The attorneys and the trial court then engaged in discussions about the issue of conflict, during which both the State and Attorney Dunham noted that any mention of an offer by the State thus far had been "hypothetical." The State remarked that its case changed after the defendant's motion to suppress his confession was granted, that the State would make an offer to the defendant, but that the inherent conflict in Attorney Dunham's dual representation would prevent the State from making an offer in the future because it would involve defense counsel advising one client to testify against another client. After an off the record discussion, the trial court determined that there was a conflict of interest, and Attorney Dunham withdrew as Foote's counsel and continued to represent the defendant at trial.

¶ 34    At the evidentiary hearing, Attorney Dunham testified that, after the trial court had granted the defendant's motion to suppress statement, the State did not make a "firm offer" to him and "no plea offer *** was actually given." He further explained that "the only offer that was given was a hypothetical one that was given in court." Attorney Dunham further testified that after the trial court granted the defendant's motion to suppress on May 3, 2006, he was "extremely confident" that the defendant would be acquitted. ASA Ahern testified that at the time of the December 12, 2006 court hearing, he had only informed the court that he could not even get to the point of making a real offer to either defendant because of the dual representation. ASA Ahern clarified at the evidentiary hearing that at the time of the December 12, 2006 hearing, he could not even know what kind of deal he would offer because he had yet to speak to his supervisor about it, had yet to speak with any witnesses to assess the strength of the State's case, and had yet to speak with the victim's family. He testified that he never made any real

offers to either the defendant or Foote, that it never passed the "preliminary hypothetical stage," and that his motivation in raising the conflict of interest issue during pretrial proceedings was to "leave the option open *** to strengthen the [State's] case against one or the other" by having one of the accused testify against the other. At the evidentiary hearing, ASA Clark also confirmed that the State never made any real plea offers to the defendant, and that a note in the trial file indicated that neither the defendant nor Foote wanted an offer.

¶ 35    We find that the only evidence that the defendant has presented is that after the trial court's May 3, 2006 denial of the motion to suppress, the State contemplated making a "hypothetical" offer to the defense, but Attorney Dunham rejected any potential offers because he thought the defense's case had "improved quite measurably." As Attorney Dunham testified at the evidentiary hearing, following the trial court's grant of the motion to suppress the defendant's incriminating statement, he was "extremely confident" that the defendant would be acquitted. We find Attorney Dunham's decision, following the trial court's grant of the motion to suppress the defendant's incriminating statement, to be reasonable, albeit misguided in hindsight. We will not evaluate counsel's performance with the benefit of hindsight, but rather will afford great deference to his decisions at the time of the pretrial proceedings. *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002) (counsel's strategic choices are virtually unchallengeable; thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel). Attorney Dunham's testimony at the evidentiary hearing also establishes that based on his pretrial conversations with the defendant about the strength of the case, the defendant "was not interested" in pleading guilty. The transcript of the October 3, 2006 pretrial proceedings also supports this notion, as Attorney Dunham informed the court on that date that

he had "spoken with the defendants and they both informed me anything short of total dismissal of these charges would not be accepted." Although the defendant points to an affidavit by Attorney Dunham, in which counsel stated that he "did not give due consideration to the plea offer that was made by [the State] to [the defendant] that involved him giving testimony against [Foote]," Attorney Dunham clarified during his testimony at the evidentiary hearing that he was referring to a hypothetical offer by the State. Because the postconviction court found counsel's testimony to be credible and the defendant's testimony incredible, which we will not disturb on appeal, we cannot conclude that defense counsel's decision not to "pursue" or "investigate" a plea offer for the defendant was deficient performance. Hindsight illuminates defense counsel's extreme confidence regarding acquittal as being misguided. However, that view of likely acquittal is understandable in light of the suppressed confession. It can therefore be inferred that defense counsel's decision to forego approaching the State for a deal on behalf of the defendant, was strategically reasonable at the time. Through the lens of hindsight and time, the fallibility of that decision is unmistakable. Unfortunately for the defendant the effectiveness of his counsel's representation is not measured through the lens of hindsight. Moreover, the defendant's claim that defense counsel failed to disclose the potential conflict to the defendant should also be rejected, as the record clearly shows that counsel did not consider the dual representation to be a problem in advocating on behalf of the defendant. Additionally, the defendant was fully aware of counsel's dual representation at all times, and the defendant was present at every pretrial court hearing in which the issue of a potential conflict of interest was raised and he never once objected to representation by Attorney Dunham. It is also noteworthy that the defendant continued his relationship with Attorney Dunham on the unrelated attempted murder case even after he was convicted in the instant case.

¶ 36    Even if Attorney Dunham's performance was unreasonable or deficient, the defendant has failed to establish that counsel's conduct prejudiced him. The defendant has failed to present any evidence showing that the State had made a plea offer to him while Attorney Dunham jointly represented him and Foote, or that counsel failed to convey an offer to him once he elected to solely represent the defendant. The record shows that any discussions about a possible offer were merely hypothetical. Thus, the defendant has failed to show a reasonable probability that but for any alleged error in Attorney Dunham's performance, he would have accepted a plea deal offered by the State, where the State never made a real offer. It should also be noted that although the defendant testified during the hearing on his postconviction petition to his likelihood of accepting a plea deal, the trial court found his testimony incredible.

¶ 37    Aside from the fact that there was no real offer by the State and that pretrial discussions only involved hypothetical offers, which would entail the defendant testifying against Foote, the defendant seems to overlook the fact that he had no constitutional right to be offered the opportunity to plea bargain. See *People v. Palmer*, 162 Ill. 2d 465, 476-77 (1994). Thus, the defendant cannot claim prejudice from defense counsel's failure to extract an offer from the State.

¶ 38    In support of his arguments that the trial court's findings were manifestly erroneous, the defendant cites *People v. White*, 362 Ill. App. 3d 1056 (2005). However, *White* is inapposite where it involved counsel's dual representation that resulted in an actual conflict of interest that manifested itself during trial, and the conflict was not alleviated by the trial court in a timely manner. *Id.* at 1061 (holding that defense counsel's cross-examination at trial was to "sacrifice" defendant for the sake of codefendant, who was acquitted). Unlike *White*, any potential conflict of interest in the case at bar, as discussed, was alleviated by the trial court on December 12,

2006, more than three months *prior* to the commencement of trial. Thus, *White* does not advance the defendant's position.

¶ 39    The defendant further makes arguments that seem to suggest that because of the initial potential conflict of interest during the period of dual representation, Attorney Dunham was also deficient for failing to pursue a plea offer from the State even *after* counsel elected to solely represent the defendant. He claims error in the trial court's findings that Attorney Dunham's "extremely confident" belief that he would be acquitted was reasonable, by pointing out that witness Johnson's "eyewitness testimony and written statement were real obstacles to [his] defense." We reject this contention. The defendant's argument actually undercuts his own position. If Johnson's testimony and written statement were "real obstacles" to the defense, then the same could be said that, during the three-month period prior to trial, ASA Ahern very well could have assessed the strength of the State's case and determined that evidence from Johnson and the victim's dying declaration identifying the defendant and Foote as the shooters, were strong enough to convict them at trial—hence, any willingness by the State to make plea offers possibly diminished. As this court already found on direct appeal, the victim's dying declaration was "singly sufficient to convict" the defendant of first-degree murder. *Hatchett*, 397 Ill. App. 3d at 511. Although it is unclear whether Attorney Dunham made any attempts to engage the State in plea negotiations *after* he withdrew from Foote's case and during the three-month period leading up to the defendant's trial, counsel's conduct could not have prejudiced the defendant where there is no evidence that State ever made a plea offer to the defense either before or after the dual representation terminated. It is crucial to note that, the State had plenty of time during the three-month period after the dual representation ended and before the defendant's trial began, to make a real plea offer to the defense. However, it chose not to do so. As the postconviction

court found, "it [is] incredible that if [the defendant] did not agree with [Attorney] Dunham's handling of the case, he would merely sit by in court day after day, without attempting to object or to seek to work out a deal with the State.  *** [The defendant], however, did not take any action, and now cannot complain about a risk he took that did not work out."  Nothing precluded the defendant from seeking to enter into plea negotiations with the State, had the State been willing to do so, after the dual representation terminated.  The truth of the matter is that this case like scores of others, comes down to trial strategy that did not work out in the defendant's favor.  Therefore, we find that the defendant failed to establish a claim for ineffective assistance of counsel based on defense counsel's dual representation of the defendant and Foote during pretrial proceedings.  Accordingly, we hold that the defendant made no substantial showing of a constitutional violation, so as to warrant a new trial, and the postconviction court's decision to dismiss the petition at the third stage of the proceedings was not manifestly erroneous.

¶ 40    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 41    Affirmed.